IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KAREN DEMATTEO<br><br>*Defendant*. | Case No. 1:25-CR-258<br><br>Trial Date: March 10, 2026 |

## UNITED STATES' TRIAL BRIEF

The United States of America, by and through its undersigned counsel, hereby files its Trial Brief to aid the Court in understanding this case and issues that may arise at trial.

### INTRODUCTION

1. **Trial Status**

On August 10, 2025, a grand jury sitting in the Eastern District of Virginia returned an 8-count indictment charging the defendant and her co-conspirator, Tae Jang, with one count of Conspiracy to Commit Wire or Bank Fraud (18 U.S.C. § 1349); five counts of Bank Fraud (18 U.S.C. § 1344) (Counts 2 and 6 relating to the defendant's conduct and 3, 4, 5 relating to Mr. Jang's conduct), one count of Conspiracy to Commit Money Laundering (18 U.S.C. § 1956(h)), and one count of Unlawful Monetary Transactions (18 U.S.C. § 1957) (this count was specific to Mr. Jang's conduct) in response to evidence of their defrauding of COVID-19 relief programs. On February 18, 2026, Mr. Jang entered a plea of guilty to Count One of the Indictment and agreed to

1

cooperate with the United States. Trial is set to commence in the defendant's case on March 11, 2026.[1]

The government anticipates calling approximately 8 witnesses.[2] The witnesses include the case agent; the defendant's co-conspirator; a representative from the Small Business Association; a representative from a financial institution defrauded by the defendant, a witness from the IRS, a representative from another financial institution that the defendant attempted to defraud, the Chapter 7 Trustee of the defendant's bankruptcy proceedings, and a forensic accountant. The estimated length of the United States' case-in-chief is approximately two to three days, depending on the duration of cross-examinations and the length of the trial day.

The government will be represented by the undersigned counsel. In addition, at government counsel's table during trial, the government will have a paralegal, who will be operating the electronic trial exhibit database.

Pursuant to Federal Rule of Evidence 615(a)(2), the government requests that Special Agent Bradley Gilmore, the primary case agent, be permitted sit at government's counsel table during trial. *See United States v. Parodi*, 703 F.2d 768, 773 (4th Cir. 1983) ("government investigative agent involved in a criminal prosecution" falls within Rule 615's exception).

The government further requests the application of Rule 615 to any witnesses the defendant intends to call to testify.

---

[1] Ms. DeMatteo signed a plea agreement, and the plea hearing is set for March 10, 2026. However, the government is filing this trial brief in an abundance of caution, in the event the trial moves forward on March 11, 2026.

[2] The government's original witness list listed two witnesses from the Small Business Administration ("SBA"). However, the government no longer intends to call Pandora Dysart and will file an amended witness list. ECF 68.

2. **Stipulations**

The government and defense have conferenced on certain stipulations regarding the admissibility and authenticity of certain evidence, TD Bank's status a financial institution as defined by 18 U.S.C. § 20, and the location of TD Bank's server that processed PPP loan applications. The parties were not able to reach an agreement on any stipulations. As such, as the government will note in this brief, the government intends to ask this Court to pre-admit voluminous business records relating to the defendant and her co-conspirator's bank accounts, loan applications and related documents from the SBA, the defendant's bankruptcy petitions, schedules, transcripts, as well as public records or the lack thereof, and have provided notice in compliance with Fed R. Evid 902(11), 902(4), 801, 803(6), and 803(10).

3. **Discovery**

The government has complied with its discovery obligations to date and will continue to do so.

The government has previously requested reciprocal discovery from the defendant in accordance with Rule 16. To date, the defendant has not provided the government with any reciprocal discovery.

### SUMMARY OF THE FACTS / EVIDENCE

1. **Overview of the Scheme**

The defendant, Karen J. DeMatteo ("DeMatteo") and her business partner and co-conspirator[3] Tae Y. Jang ("Jang") owned and operated several real estate limited liability companies ("LLCs") in the Eastern District of Virginia, where they both resided.

---

[3] On February 18, 2026, Jang pleaded guilty for his role in this conspiracy. ECF 52-54.

DeMatteo and Jang owned and operated the following entities (among others):

a. TK United Investments, LLC

b. T&B Construction Service Company, LLC

c. T&B Capital, LLC

d. 3808 Mount Atlas Lane, LLC

e. Amartin Development, LLC

f. TK Holdings, LLC

g. KCAP, LLC (which was owned exclusively by DeMatteo)

The defendant and Jang submitted Economic Injury Disaster Loan ("EIDL") and Paycheck Protection Program ("PPP") loan applications (collectively, "COVID-19 relief loan applications") for their companies to financial institutions and the Small Business Administration ("SBA").

By at least early April 2020, DeMatteo and Jang submitted at least 15 COVID-19 relief loan applications on behalf of their business entities, including entities that were no longer engaged in legitimate business activities. They submitted fraudulent and false loan applications to financial institutions to obtain a greater loan amount than they were entitled to receive. In some applications, DeMatteo and her partner falsely claimed a significantly higher payroll and number of employees than accurately existed at the time of the application. DeMatteo and Jang would also submit separate COVID-19 relief loan applications for the same company with vastly different information. They provided financial institutions with fabricated business tax forms and payroll schedules to falsify their income and expense levels and defraud these COVID-19 relief loan programs.

The defendant and her co-conspirator spent a portion of the EIDL and PPP loan proceeds they received on paying down the debt owed to purchase properties, withdraw cash, and purchase

4

cryptocurrency, impermissible expenses under the terms of the COVID-19 loans. Some examples of these impermissible expenses of the COVID-19 relief loan funds include but are not limited to the expenditures of $403,601 to 14 different real estate and title companies. Of the $403,601 in loan proceeds, there were three wires of $117,196, $63,040, and $35,608 that were sent to purchase three different houses in Maryland.  DeMatteo transferred $132,383 into an account she controlled. Jang transferred $118,781 to an account he controlled. Further financial analysis revealed that DeMatteo used at least $86,742 of the loan proceeds to purchase cryptocurrency, and the remainder was sent to investment firms.

DeMatteo filed for bankruptcy on or about December 2, 2020. In doing so she filed her petition for bankruptcy. Her filing was irreconcilable with her COVID-19 relief loan applications. Her bankruptcy petition was supposed to provide a full picture of her active businesses but did not list her ownership interests in T&B Capital, LLC, T&B Construction Service, LLC, 3808 Mount Atlas Lane, LLC, Amartin Development, LLC, TK United Investments, LLC, TK Holdings, LLC, and KCap, LLC. These were all businesses that she demanded support for in her COVID-19 relief loan applications earlier that year. In the COVID-19 relief loan applications, DeMatteo further claimed that she owned a percentage of all the above-listed businesses and that they were still in operation at the time of her applications. Moreover, DeMatteo did not list the debts that these businesses had incurred for the COVID-19 relief loans. Even though the COVID-19 loans were taken out in the names of the businesses, DeMatteo was a guarantor on the loans and should have still disclosed these obligations on her bankruptcy petition as SBA was one of her general unsecured creditors.

On or about December 30, 2020, DeMatteo attended Meeting of Creditors as required by the bankruptcy proceedings, and, in the transcript of that meeting, DeMatteo denied have a partial

or full interest in several of her companies in direct contradiction of her EIDL and PPP loan applications. On or about January 5, 2021 in a subsequent Meeting of Creditors, DeMatteo made claims that included that her partner, Jang, had received a $149,900 SBA loan for a residence she was currently residing in, that her company T&B Construction Service, LLC owned no assets and was not conducting business, and again denied a partial or full interest in several companies in direct contradiction of her EIDL and PPP loan applications. In her testimony, DeMatteo stated that T&B Construction Service had ceased doing any business since sometime in 2019, despite filing for COVID-19 Relief Loans for upwards of $400,000 and claiming the company had 25 or 35 employees.

On or about March 8, 2021, DeMatteo filed her Amended Bankruptcy Schedules, which further demonstrate a different representation of her income and active businesses than her COVID-19 relief loan applications. In her Amended Schedules, DeMatteo listed some businesses which received COVID-19 relief loans,[4] but failed to mention T&B Capital, LLC, T&B Construction Service, LLC, Amartin Development, LLC, TK United Investments, LLC, and KCap, LLC.

**The Witnesses**

### a. SBA Representative

The government intends to call a witness employed by the SBA, Ms. Kandace Zelaya to explain the purpose of the CARES Act and the PPP. She will provide background on the PPP which was made available to the general public during the period of the defendant's conduct, the

---

[4] While DeMatteo did list TK Holdings LLC and 3808 Mount Atlas Drive in her Amended Schedules, she notes that TK Holdings was closed in 2020 and filed substantiating documentation with the Virginia Secretary of State's Office. The Defendant filed for an additional COVID-19 relief loan for TK Holdings in 2021.

forms the defendant and her co-conspirator fraudulently submitted to obtain their COVID-19 relief loans, the purposes of those loans, and what those loans were intended for, and what permissible expense under the PPP. Ms. Zelaya will also testify about the materiality of certain omissions and misrepresentations by the defendant on her PPP loan applications.

### b. IRS Witness

The government intends to call a witness employed by the Internal Revenue Service. This witness will explain the tax records the defendant attached to her PPP loan applications did not match the tax information that the defendant actually filed with the IRS. The witness is expected to testify that multiple of Ms. DeMatteo's businesses, including T&B Construction Service Company, LLC and TK Holdings, LLC, and Ms. DeMatteo herself did not file taxes in 2019 through 2021.

### c. Financial Institution Witnesses

The government intends to call Ms. Eileen Key a witness from TD Bank, identified as BANK A in the indictment, the financial institution who initially funded the COVID-19 relief loans per the CARES Act program. She provides insight into the management of the loan applications, the wire transfers that occurred to process the loan applications, and, if deemed necessary, the authentication and admission of the bank records.

The government also intends to call Mr. Jason Detrick, who was previously employed by Bay First Bank. Mr. Detrick was involved with Ms. DeMatteo's PPP loan application on behalf

of KCap, LLC. Mr. Detrick is expected to testify about an email exchange that he had with Ms. DeMatteo regarding KCap, LLC's loan application and the application's supporting documents.

### d. Tae Jang, Co-Conspirator

The government intends to call Mr. Tae Jang, the defendant's business partner and co-conspirator. He will testify as to the operation of their fraud scheme. He will testify that the defendant and he misrepresented their businesses number of employees, payroll expenses, and gross revenues, and made other false statements in their submissions to financial institutions in order to obtain loans in amounts they were not entitled to. Jang will testify that while the defendant managed the submission of the Covid-19 relief loan applications, including the ones submitted in his name, they were both aware of the applications, and aware the statements made in those applications were false when they made them.[5]

### e. Chapter 7 Bankruptcy Trustee

The government will also call Mr. Don King, who was the Chapter 7 Trustee of the defendant's bankruptcy case. If needed, Mr. King will authenticate certain records from the defendant's bankruptcy proceeding including her initial petition, amended schedules, and several transcripts from the Meetings of Creditors hearings. Mr. King will explain what information was supposed to be disclosed by the defendant in the bankruptcy proceeding, including her ownership interests of her various companies. Mr. King will also testify that he received several tax returns from the defendant for 2018, 2019, and 2020. Notably, these tax returns do not match the tax information submitted with the defendant's COVID-19 relief loans much less what was submitted

---

[5] Mr. Jang will require the services of a Korean interpreter.

8

to the IRS during that time. Finally, Mr. King will also testify about the cryptocurrency transfers that were uncovered during the defendant's bankruptcy proceeding.

### f.  Case Agent

The government intends Special Agent Bradley Gilmore of the United States Agency for International Development Inspector General, our case agent, as a witness. Special Agent Gilmore will be able to lay out the chronology of the government's investigation into the defendant's scheme. He will testify about the PPP and EIDL loan applications filed by the defendant, but inconsistencies in those submissions across the COVID-19 relief loan applications and forgiveness applications, the fact that the defendant and Mr. Jang did not report any employees to the Commonwealth of Virginia. Special Agent Gilmore is expected to introduce into evidence the Virginia Employment Commission ("VEC")'s Lack of Record Certification that explains how the VEC has a lack of employee wage records for Karen DeMatteo, T&B Construction Service Company, LLC, TK Holdings, LLC, and several of Ms. DeMatteo's other companies. Special Agent Gilmore will also testify that before they submitted their COVID-19 relief loan applications, the defendant and Jang, stated that they had "2 employees" (referring to themselves) on financial documents. Special Agent Gilmore will also be able to walk through the defendant's unlawful expenditures on other real estate properties, personal expenses, investments, and cryptocurrency.

### 2.  Forensic Accountant

To assist the jury in understanding the flow of investor money, the government will rely on the testimony of forensic accountant Ms. Kelsey Halloran, a consultant retained through FTI Consulting and the use of summary charts. Ms. Halloran has reviewed the defendant's and her co-conspirators accounts and transactions, and she will testify regarding the transactions, focusing on

the disposition of the fraudulently obtained government funds. The summary charts and their use and admissibility are described below.

The government does not intend to qualify Ms. Halloran as an expert. Forensic accountants commonly provide lay testimony to trace funds through bank accounts and to conduct basic computations. For example, in *United States v. Fenner*, an FBI forensic accountant was called to summarize "over tens of thousands" of pages of bank records for the defendant's businesses and to "trace[] the flow of money through bank accounts, expense sheets, and emails." 142 F.4th 510, 516 (7th Cir. 2025). Over the defendant's objection, the District Court permitted the accountant to testify without being qualified as an expert about the monetary flows and how much money the defendants had earned from the schemes, among other things. The Seventh Circuit upheld the decision, and provided an extensive explanation as to why expert testimony was *not* required for lay accountant testimony:

> Deploying basic arithmetic of addition and subtraction, even repeatedly, is often within the realm of lay, not expert, testimony. . . While the "volume of math" [the accountant] performed was large, the method was simple. In forming her opinions that [Defendant 1] was funding [Defendant 2's] bank account, she noted [Defendant 1] never paid cash for the vehicles at auction, and [Defendant 1] and [Defendant 2] raked in over one million dollars through the scheme. This was [the accountant] performing rudimentary math. . . . Her testimony, cabined to this particular investigation, required attention to detail; it did not require expertise beyond the ken of a lay person.

*Id.* at 518. The Seventh Circuit's decision is consistent with other circuits. *See, e.g, United States v. Davis*, 53 F.4th 833, 849 (5th Cir. 2022) (same); *United States v. Shaw*, 891 F.3d 441, 454 (3d Cir. 2018) ("His testimony was based on subtraction, not 'scientific, technical, or other specialized knowledge within the scope of Rule 702'"); *Ryan Dev. Co., L.C. v. Ind. Lumbermens Mut. Ins. Co.*, 711 F.3d 1165, 1170 (10th Cir. 2013) (upholding admission of accountants' testimony that relied on "basic arithmetic, personal experience, and no outside expert reports in calculating lost

income and other claims for coverage"); *United States v. Dukes*, 242 F. App'x 37, 49 (4th Cir. 2007) (holding that the district court properly admitted testimony of accountant with the Securities and Exchange Commission, called by the Government as a fact witness to present financial summary charts); *United States v. Mosby*, 626 F. Supp. 3d 847, 864 (D. Md. 2022), *aff'd*, 143 F.4th 264 (4th Cir. 2025). Consistent with this well-established precedent, a forensic accountant testifying about the flow of funds or conducting a basic computation does not need to be qualified as an expert. Despite that, in an abundance of caution, the government provided an expert notice regarding Ms. Kelsey Halloran's testimony on February 20, 2026.

## APPLICABLE LAW

1. **Conspiracy to Commit Wire or Bank Fraud** (18 U.S.C. § 1349) and **Bank Fraud** (18 U.S.C. § 1344)

The defendant is charged in Counts One, Two, and Six of the Indictment with Conspiracy to Commit Wire and Bank Fraud, in violation of 18 U.S.C. § 1349 and Bank Fraud in violation of 18 U.S.C. § 1344. "Conspiracy to commit wire [and bank] fraud under 18 U.S.C. § 1349 requires a jury to find that (1) two or more persons agreed to commit wire [and bank] fraud and (2) the defendant willfully joined the conspiracy with the intent to further its unlawful purpose." *United States v. Burfoot*, 899 F.3d 326, 335 (4th Cir. 2018)

Wire fraud has two essential elements: a scheme to defraud, and the use of wire communications in furtherance of the scheme. *See United States v. Godwin*, 272 F.3d 659, 666 (4th Cir. 2001). Unpacking these two elements yields the following elements:

One:        Defendant knowingly devised or intended to devise a scheme or artifice to obtain money or property by means of material false or fraudulent pretenses, representations, or promises;

11

Two:          The pretenses, representation, or promises were material, that is, they would reasonably influence a person to part with money or property;

Three:        Defendant did so with the intent to defraud; and

Four:         In advancing, or furthering, or carrying out this scheme to obtain money or property by means of false or fraudulent pretenses, representations, or promises, Defendant transmitted any writing, signal, or sound by means of a wire, radio, or television communication in interstate or foreign commerce or caused the transmission of any writing, signal, or sound of some kind by means of a wire, radio, or television communication in interstate or foreign commerce.

2A O'Malley, Grenig & Lee, *Federal Jury Practice and Instructions*, § 47:07 (7th ed. updated July 2025).

The elements of bank fraud are as follows:

One:          that the defendant knowingly executed [or attempted to execute] a scheme or artifice to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody of, a financial institution by false or fraudulent pretenses, representations, or promises;

Second:       that the defendant did so with intent to defraud; and

Third:        that the financial institution was then federally insured.

*See United States v. Adepoju*, 756 F.3d 250, 255 (4th Cir. 2014) (listing elements).

The phrases "any scheme or artifice to defraud" and "any scheme or artifice for obtaining money or property" mean any deliberate plan of action or course of conduct by which someone intends to deceive or to cheat another or by which someone intends to deprive another of something of value. Significantly, "the wire fraud [and bank fraud] statute punishes the scheme, not its success." *Pasquantino v. United States*, 544 U.S. 349, 371 (2005).

A material fact is a fact that would be of importance to a reasonable person in making a decision about a particular matter or transaction. A statement or representation is "material" if it

12

has a natural tendency to influence or is capable of influencing a decision or action of the individual that the statement or representation is made to. For materiality, the "correct test . . . is an objective one." *United States v. Raza*, 876 F.3d. 604, 621 (4th Cir. 2017). To be "material," it is not necessary that the statement or representation, in fact, influence or deceive. In other words, "[a] misrepresentation is material if 'a reasonable [person] would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.'" *United States v. Gillion*, 704 F.3d 284, 296 (4th Cir. 2012) (quoting *Neder v. United States*, 527 U.S. 1, 25 (1999)); *see also Gillion*, 704 F.3d at 297 (upholding jury instructions in mail fraud case that "[a] statement is material if it has a natural tendency to influence or is capable of influencing the decision-making body to which it was addressed"); *United States v. Lambert*, 2022 WL 2871909, at *3 (4th Cir. July 21, 2022) ("A fact is material if it has a natural tendency to influence or is capable of influencing the intended victim." (quoting *United States v. Pasquantino*, 336 F.3d 321, 333 (4th Cir. 2003) (en banc))).

The term "false or fraudulent pretenses, representations, or promises" means a statement or an assertion which concerns a material fact or a material aspect of the matter in question and that was either known to be untrue at the time that it was made, or that was made with reckless indifference as to whether it was true or false. The term includes actual, direct false statements as well as half-truths, and includes the knowing concealment of facts that are material or important to the matter in question and that were made or used with the intent to defraud. 2A O'Malley, Grenig & Lee, *Federal Jury Practice and Instructions*, § 47:13; 47:14 (7th ed. updated through July 2025). "It is hornbook law that material omissions can form the basis for fraud as much as material misrepresentations." *United States v. Colton*, 231 F.3d 890, (4th Cir. 2000) (finding that fraudulent concealment or suppression of material facts supported bank fraud prosecution) (citing

*United States v. Keplinger*, 776 F.2d 678, 697 (7th Cir. 1985) (concealment of material information can constitute fraud under mail fraud statute)). Put differently, sufficient evidence of a scheme to defraud can rest entirely on truthful statements if there are also significant material omissions calculated to deceive a victim. *See United States v. Souder*, 436 F. App'x 280, 286-289 (4th Cir. 2011).

As is relevant in this case, communications having a propensity to lull and forestall action may form an integral part of the overall scheme to defraud. *United States v. Painter*, 314 F.2d 939, 943 (4th Cir. 1963) (citing *United States v. Sampson*, 371 U.S. 75, 80 (1962)). In other words, "deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter" may constitute a scheme to defraud. *Colton*, 231 F.3d at 899; *see also Lustiger v. United States*, 386 F.2d 132, 136 (9th Cir. 1967) ("[W]hile the statements in the advertising material may not have been literally false, taken as a whole they were fraudulently misleading and deceptive."); *United States v. Woods*, 335 F.3d 993, 997-98 (9th Cir. 2003) ("[T]he arrangement of the words or the circumstances in which they are used may create an appearance which is false or deceptive, even if the words themselves fall short of this.").

An object of the scheme must be to obtain money or property from the SBA and financial institutions, including TD Bank, through deceit. "[T]o convict a person of defrauding another, more must be shown than simply an intent to lie to the victim or to make a false statement to him." *United States v. Johnson*, 2022 WL 4376082, at *1 (4th Cir. 2022) (quoting *United States v. Wynn*, 684 F.3d 473, 478 (4th Cir. 2012)). Specifically, "a scheme to defraud 'must be one to deceive the [victim] *and* deprive [him or her] of something of value.'" *Id.* (quoting *Shaw v. United States*, 580 U.S. 63, 72 (2016)); *see also United States v. Skinner*, 2023 WL 2770952, at *1 (4th Cir. 2023) (per curiam) (holding in bankruptcy case that "[s]pecific intent to defraud requires the intent 'to

14

deprive one of something of value through a misrepresentation or other similar dishonest method, which indeed would cause him harm'" (quoting *Wynn*, 684 F.3d at 478)). The phrase "transmits by means of wire, radio, or television communication in interstate commerce" means to send from one state to another by means of telephone or telegraph lines or by means of radio or television. The government need not prove that the defendant actually used a wire communication in interstate commerce or that the defendant even intended that anything be transmitted in interstate commerce by means of a wire, radio, or television communication to further, or to advance, or to carry out the scheme or plan to defraud.

### 2. Conspiracy to Commit Money Laundering

The defendant is charged in Count 7 of the Indictment with Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h). The elements of conspiracy to commit money laundering are: (1) an agreement between two or more persons to commit money laundering; (2) the defendant knew that the proceeds had been derived from an illegal activity; and (3) defendant knowingly and voluntarily became part of the conspiracy. *United States v. Green*, 599 F.3d 360, 371 (4th Cir. 2010).

The government will satisfy its burden on this charge through the bank records, loan applications, bankruptcy transcripts and petitions, and public records associated with the defendant's fraud, as well as the testimony of her co-conspirator through trial. This same evidence will demonstrate the financial transactions necessary to sustain a money laundering charge.

The evidence will demonstrate that the defendants were in control of over 25 bank accounts at various financial institutions. They moved the hundreds of thousands of dollars they fraudulently procured from the United States with their fictitious COVID-19 relief loan

15

applications between these accounts. Those transfers between accounts in the Eastern District of Virginia and elsewhere constituted monetary transactions affecting interstate commerce within the meaning of 18 U.S.C. § 1956 and 1957. *See United States v. Ravenell*, 66 F.4th 472, 480 (4th Cir. 2023).

The proceeds which were the subject of those transactions are from bank fraud and wire fraud, specified unlawful activities (SUA) of the kind associated with the money laundering count charged. *See* 18 U.S.C. §§ 1956(b)(7), 1961 (listing SUA offenses, violations of 18 U.S.C. § 1343 and 1344 are included); *see also United States v. Shirkhani*, 1993 U.S. App. LEXIS 5405, at *10 (4th Cir. Mar. 17, 1993) (noting that in cases in which the bank fraud involves deceit or misrepresentation, it satisfies the SUA requirement for an 18 U.S.C. § 1957 money laundering count). The fact that the defendant was not charged with substantive wire fraud counts is irrelevant. The wire fraud scheme was described within Count One of the indictment (the conspiracy to commit wire fraud and bank fraud) and Fourth Circuit precedent is clear that "a defendant may be convicted of money laundering even if she is not a party to, much less convicted of, the specified unlawful activity." *United States v. Cherry*, 330 F.3d 658, 667 (4th Cir. 2003).

**EVIDENTIARY ISSUES**

### 1. Statements by the Defendant and Rule of Completeness

The government intends to introduce into evidence several prior statements by the defendant, including transcripts of the defendant's Meeting of Creditors hearings during her bankruptcy proceedings, her petition for bankruptcy, her amended bankruptcy schedules, and the 2018, 2019, and 2020 tax returns she provided to the Chapter 7 bankruptcy trustee. The government has provided a public records notice as well as a Fed R. Evid 404(b) notice to provide

abundant notice of the documents it will be referring to during this trial. The defendant's statements about her companies in her bankruptcy filings and at her Meeting of Creditors hearings go straight to the heart of her fraud scheme. The government filed its 404B Notice on February 24, 2025, which noticed its intent to admit these records from Ms. DeMatteo's bankruptcy proceeding.

Under Federal Rule of Evidence 901, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must provide evidence sufficient to support a finding that the item is what the proponent claims it is." The rule then sets forth mechanisms by which evidence may be authenticated, including the testimony of a witness with knowledge. All the statements relating to the bankruptcy proceeding were taken from the bankruptcy docket Case No. 20-12626-BFK. "The burden to authenticate under Rule 901 is not high—only a *prima facie* showing is required." *United States v. Kaixiang Zhu*, 854 F.3d 247, 257 (4th Cir. 2017). Although the government posits that Ms. DeMatteo's bankruptcy filings could be introduced as public records, the government intends to call Mr. King who participated in the hearings at issue and reviewed her bankruptcy filings as the trustee. Mr. King will be able to authenticate the documents and more than satisfies the standard under Federal Rule of Evidence 901.

The government intends to offer these statements made by the defendant as statements by a party opponent. A defendant's statement is not hearsay when offered by the government as a party opponent. Fed. R. Evid. 801(d)(2)(A). While the government is free to introduce against the defendant her own statements in accordance with the party opponent rule under Federal Rule of Evidence 801(d)(2), the defendant may not use her own prior statements even where the government introduced some portion of them. *See Williamson v. United States*, 512 U.S. 594, 600-601 (1994). When offered by the defendant, those statements are inadmissible hearsay, and no exception applies. *See* Fed. R. Evid. 801-803; *see also United States v. Gordon*, 754 Fed. Appx.

171 (4th Cir. 2018) (noting in an unpublished opinion that the defendant's bankruptcy pleadings were admissible non-hearsay and that the defendant's statements as well as the statements of their attorney acting as his agent, during and within the scope of the principal-agent relationship also qualified as admissible non-hearsay.)

Nor does the "rule of completeness" allow the defendant to introduce portions of her out-of-court statements not offered by the government. *See* Fed. R. Evid. 106. This rule simply allows an adverse party to require that other admissible evidence be introduced at the same time if fairness so requires, particularly to clarify or explain content already admitted, or prevent the jury from being misled. *See United States v. Hassan*, 742 F.3d 104, 134 (4th Cir. 2014). For example, if a defendant were asked, "You went to the store and killed him, didn't you?," the government could not just admit the portion of his response stating, "Yes," while omitting the full statement, "Yes I went to the store, but I did not kill him." Thus, the rule "goes only so far as is necessary to shield a party from adverse inferences." *United States v. Moussaoui*, 382 F.3d 453, 481 (4th Cir. 2004).

However, "the rule of completeness does not 'render admissible . . . evidence which is otherwise inadmissible under the hearsay rules.'" *Hassan*, 742 F.3d at 134 (quoting *United States v. Lentz*, 542 F.3d 501, 526 (4th Cir. 2008)). In other words, the rule of completeness does not allow the defendant to admit her own inadmissible hearsay. "Nor does the rule of completeness require the admission of self-serving, exculpatory statements made by a party which are being sought for admission by that same party." *Id.* (internal quotation marks omitted). "The fact that some of the omitted testimony arguably [is] exculpatory does not, without more, make it admissible under the rule of completeness." *Lentz*, 524 F.3d at 526 (cleaned up) (quoting *United States v. Bollin*, 264 F.3d 391, 414 (4th Cir. 2001)).

### 2. Use of Summary Charts

The United States anticipates introducing summary exhibits at trial. The information underlying these charts was drawn from thousands of pages of bank records involved in this case. All the underlying evidence was produced to the defendant in discovery. The summary charts include: (1) charts that trace and depict the disposition of the COVID-19 relief loan monies, (2) charts that summarize the defendant and Jang's expenditures of the COVID-19 relief monies, (3) charts that summarize the defendant and Jang's COVID-19 relief loan applications, and (4) a chart that summarizes the ownership information of the 25 bank accounts that the defendant and Jang used during the fraud scheme. Summary and demonstrative exhibits are admissible under Federal Rule of Evidence 1006 and/or 611(a).

### a. *Rule 1006 Summaries*

Rule 1006 charts are admitted as direct evidence to assist the trier of fact in comprehending voluminous records. As the rule states: "The court may admit as evidence a summary, chart, or calculation offered to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court, whether or not they have been introduced into evidence." Fed. R. Evid. 1006.[6] "Rule 1006 permits summary charts to be admitted into evidence 'as a surrogate for underlying voluminous records that would otherwise be admissible into evidence.'" *United States v. Ortiz-Orellana*, 90 F.4th 689, 699 (4th Cir. 2024). "No limiting instruction is required for summary charts admitted under Rule 1006 because Rule

---

[6] The rule was amended in 2024 to prevent confusion on these points. The 2024 Advisory committee notes state: "But the purpose of Rule 1006 is to permit alternative proof of the content of writings, recordings, or photographs too voluminous to be conveniently examined in court. To serve their intended purpose, therefore, Rule 1006 summaries must be admitted as substantive evidence and the rule has been amended to clarify that a party may offer a Rule 1006 summary 'as evidence.' The court may not instruct the jury that a summary admitted under this rule is not to be considered as evidence. Rule 1006 has also been amended to clarify that a properly supported summary may be admitted into evidence whether or not the underlying voluminous materials reflected in the summary have been admitted."

1006 summaries are independent evidence . . . ." *United States v. Simmons*, 11 F.4th 239, 262 n.13 (4th Cir. 2021).

Accordingly, district courts routinely allow the government to introduce charts and summaries of evidence. *See United States v. Johnson*, 319 U.S. 503, 519 (1943). The summaries need not contain a defendant's anticipated evidence. *See, e.g., Myers v. United States*, 356 F.2d 469, 470 (5th Cir. 1966); *Barsky v. United States*, 339 F.2d 180, 181 (9th Cir. 1964). Copies of the summaries may be used during the testimony concerning them. *See Myers,* 356 F.2d at 470. Moreover, the summaries may be used during deliberations. *See United States v. Bray*, 139 F.3d 1104 (6th Cir. 1998); *United States v. Possick*, 849 F.2d 332, 339 (8th Cir. 1988); *United States v. Koskerides*, 877 F.2d 1129, 1134 (2d Cir. 1989).

### b.  *Rule 611(a) Summaries (Pedagogical Aids)*

Summary charts may also be admitted into evidence under Rule 611(a). *Simmons*, 11 F.4th at 262 n.12 (citing *United States v. Johnson*, 54 F.3d 1150, 1159 (4th Cir. 1995)). Summary charts are admissible pursuant to this rule "to facilitate the presentation and comprehension of evidence already in the record." *United States v. Janati*, 374 F.3d 263, 273 (4th Cir. 2004). "[P]edagogical charts or summaries may include witnesses' conclusions or opinions, or they may reveal inferences drawn in a way that would assist the jury." *Id.* When a chart is admitted under Rule 611, "a court should provide a limiting instruction to 'ensure that the jury does not rely on the that chart as independent evidence,' but instead focuses its deliberations on 'the evidence upon which that chart is based.'" *Ortiz-Orellana*, 90 F.4th at 699 (quoting *United States v. Simmons*, 11 F.4th 239, 262 (4th Cir. 2021)).

### 3.  Improper Use of Interview Summaries

The government has produced interview summaries prepared by the law enforcement

agents investigating this case in discovery. These summaries are not statements of the person being interviewed under the Jencks Act, and the parties should be precluded from introducing the contents of the reports to impeach such witnesses during cross-examination, publishing the contents of the reports to the jury, or otherwise suggesting to the jury that the reports are statements of the witnesses who did not write them or adopt them.

The Jencks Act requires that, after a government witness testifies on direct examination, the government must provide the defense with any statements made by the witness that relates to the subject of his or her testimony. See 18 U.S.C. § 3500. The Jencks Act defines a statement as "a written statement made by said witness and signed or otherwise adopted or approved by him," a recording or transcription that "is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously," or a statement made by a witness to the grand jury. See 18 U.S.C. § 3500(e). In *Palermo v. United States*, 360 U.S. 343 (1959), the Supreme Court held that, because the Jencks Act is meant to restrict the defendant's use of discoverable statements to impeachment, "only those statements which could properly be called the witness's own words should be made available to the defense." *Id*. at 349, 352.  The Court explained that "summaries of an oral statement which evidence substantial selection of material" or "statements which contain [an] agent's interpretations or impressions" are "not to be produced." Id. at 352-53.

Consistent with *Palermo*, the law enforcement interview summaries produced to the defense in this case are not witness statements of the individuals interviewed discoverable under the Jencks Act. Unless the witnesses have reviewed and adopted the reports—which was not the practice in this case—the reports cannot qualify as statements covered by § 3500(e)(1). Moreover, the reports were finished after interviews were completed and reflect the thought processes and interpretations of the agents and officers; they do not constitute a contemporary and substantially

21

verbatim recital of the witness's statement under § 3500(e)(2).

Although production of the reports is not required, in this case the government has provided broad discovery, including law enforcement summaries of interviews. The government will continue to produce such reports before trial as it conducts additional interviews with witnesses it expects to call at trial. In this circumstance, the defense should be limited to using the reports consistent with the law and Rules of Evidence. In particular, the defense should be precluded from introducing the contents of the reports to impeach witnesses based on inconsistent statements, because the reports are not the statements of the witnesses being interviewed. Moreover, the defense should be precluded from publishing the contents of the reports to the jury, or otherwise suggesting to the jury that the reports are statements of the witness and that those statements, for example, contain inconsistencies. To allow otherwise would contradict the Jencks Act and the Supreme Court's decision in *Palermo*, holding that it would "be grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness's own rather than the product of the investigator's selections, interpretations, and interpolations." 360 U.S. at 350.

The government has been committed to providing broad discovery in this case and has provided (and will continue to provide) reports for its witnesses and other individuals interviewed during its investigation. In turn, the parties must use the reports in accordance with the law and Rules of Evidence, and they should not be permitted to introduce the reports, publish them to the jury, or otherwise suggest to the jury that the reports are statements of the witnesses.

### 4. Rules 803(6), 803(10), 902(4) and 902(11)

The government intends to offer numerous business and public records into evidence. These records fall squarely under Rule 803(6) and are certified by the custodian of records for the

relevant banks. Additionally, on February 25, 2026 (and in supplemental notices),[7] the government provided notice to the defense of its intent to introduce these records and have provided copies in discovery for the defense's inspection months in advance of this notice. Accordingly, these records are self-authenticating under Rule 902(11) as a Certified Domestic Record of Regularly Conducted activity and Rule 902(4) as Certified Copies of Public Records.

While the government has made every effort to identify the materials that it intends to use in its case-in-chief in advance, it is possible that the government will need to introduce other documents to rebut, address, or otherwise explain arguments or evidence that the defendant offers in her defense.

To prepare for this possibility, the government intends to rely upon the case agent. He will testify that he received the bank records pursuant to a subpoena for the accounts. He will testify that those records were accompanied by a certificate issued pursuant to Rule 902(11) attesting to the fact that the records provided domestic records of a regularly conducted activity and are self-authenticating.

The requirements for admission of a business record may be met without the testimony of a custodian or other witness. *See, e.g.,* Fed. R. Evid. 902(11) (certified domestic records of regularly conducted activity). Records otherwise admissible pursuant to Federal Rule of Evidence 803(6) based on the testimony of a custodian of records may be admitted without live testimony, provided the custodian of record signs an affidavit under penalty for perjury that the records meet the requirements under Rule 803(6). *See* Fed. R. Evid 902(11). The government has produced the 902(11) certificate associated with the bank records and has noticed its intent to rely on this

---

[7] The United States also filed a 902-11 on the docket on March 3, 2026. *See* ECF 67.

certificate at trial. While the defendant has indicated they unwilling to stipulate to the admissibility of these records, the government has not received any specific objection to their admission.

### 5. The Defendant's Signed Statement of Facts

If this matter does proceed to trial, the United States will move to admit the defendant's signed Statement of Facts as an admission of a party opponent. Within the Statement of Facts, the defendant specifically agreed "that this statement of facts should not be excluded or suppressed under Fed. R. Evid. 410, Fed. R. Crim. P. 11(f), the Sentencing Guidelines or any other provision of the Constitution or federal law." As such, the defendant waived these protections, and her statements within the Statement of Facts should be admissible. *See United States v. Alazzam*, No. 1:08CR101 (JCC), 2009 WL 3245392, at *3 (E.D. Va. Sept. 29, 2009) ("The Supreme Court in *United States v. Mezzanatto,* 513 U.S. 196 (1995), addressed the validity of Rule 410 and Federal Rule of Criminal Procedure 11(e)(6) (now Rule 11(f)) waiver that would render defendant's statements made in the course of plea discussions admissible.") (collecting cases).

### 6. Blaming Poor Record Keeping

The government anticipates that the defendant may attempt to blame her co-conspirator for the entirety of her malfeasance or argue that her non-compliance with the contractual provisions of her COVID-19 relief loans were the result of poor bookkeeping or external pressures. The evidence will demonstrate that the defendant managed the finances for all of her joint ventures with her co-conspirator. The defendant's name and signature are on numerous fraudulent loan application documents and the money for them was deposited into a number of accounts that she controlled on her own. This money was supposed to be used as working capital and to pay legitimate employees of the business, not on purchasing additional properties, investments, or cryptocurrencies and the applications are clear about those restrictions on their face. Further, the

defendant's consciousness of guilt is apparent from the manner in which the applications are submitted, not only are there fraudulent inflations of material information like the number of employees, she submitted fabricated documents to facilitate her fraud. She did this because she knew she was not entitled to receive the COVID-19 relief loans.

### 7. Jury Nullification

The government respectfully moves this Court to preclude the defendant from arguing or otherwise presenting evidence or pursuing lines of inquiry designed to elicit or encourage jury nullification. It is improper for a defendant to suggest that the jury should acquit a defendant even if it finds that the government has met its burden of proof under the law. *See United States v. Muse*, 83 F.3d 672, 677 (4th Cir. 1996) (noting although "a jury has the power of nullification[,] . . . defense counsel is not entitled to urge the jury to exercise this power"); *see also United States v. Lynch*, 903 F.3d 1061, 1080 (9th Cir. 2018) ("[N]ullification is by its nature a rejection of" a juror's duty to follow the law.).

"A defendant's right to present evidence in support of his defense . . . is not without limits." *United States v. Espinoza-Baza*, 647 F.3d 1182, 1188 (9th Cir. 2001) (citing *Greene v. Lambert*, 288 F.3d 1081, 1090 (9th Cir. 2002)). "While the Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence" that is irrelevant, lacking in foundation, or when "its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Id.* (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006)). See Fed. R. Evid. 401, 403. Here, certain categories of evidence that the defendant may seek to introduce

at trial do not bear on her guilt or innocence but instead would only serve to encourage the jury to nullify, making them irrelevant and likely to confuse the issues and mislead the jury.

The defendant is not required to disclose their trial strategy, and while the government is not able to anticipate each potential avenue of jury nullification that the defendant may seek to pursue at trial, the government notes that the defendant may attempt to suggest that this was a victimless crime or that the government's application and assessment process should have been more rigorous in preventing the kind of fraud the defendant perpetrated. The Court should significantly limit this kind of inquiry and testimony.

## CONCLUSION

The United States has summarized some of the issues that may arise at trial. Should any additional issues arise, the United States respectfully requests leave to submit such further briefing as may be necessary.

Respectfully submitted,

By: _____/s/_____
Kathleen Robeson
Assistant United States Attorney
Dahoud A. Askar
Special Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3779
Email: Dahoud.Askar@usdoj.gov

26

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 4th day of March 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

<u>/s/ Kathleen E. Robeson</u>
Kathleen E. Robeson
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Office Number: (703) 299-3700
Facsimile Number: (703) 229-3982
Email Address: Kathleen.robeson@usdoj.gov